[Cite as *In re L.H.*, 2022-Ohio-3263.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re L.H., N.H.                                    Court of Appeals No.  L-22-1078

                                                   Trial Court No.  JC 20280409

                                                   **DECISION AND JUDGMENT**

                                                   Decided:  September 16, 2022

* * * * *

Bradley W. King, for appellee.

Adam H. Houser, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common

Pleas, Juvenile Division, which awarded permanent custody of the minor children, L.H.

and N.H., to appellee, Lucas County Children Services ("LCCS"), thereby terminating

the parental rights of mother-appellant, J.A.[1]  For the reasons that follow, we affirm.

---

[1] Father, J.H., whose parental rights were also terminated, is not a party to this appeal.  In
addition, mother has two older children, O.S. and A.S., who were placed in the legal
custody of their father, J.S.  Mother does not appeal the judgment awarding legal custody
to J.S.

## I. Facts and Procedural Background

{¶ 2} The present case began on June 4, 2020, when LCCS filed a complaint in dependency and neglect, alleging ongoing issues involving mother's drug abuse and concerns of domestic violence. On July 20, 2020, mother consented to a finding of dependency and neglect, and the children were placed with a maternal aunt. Mother was provided with case plan services to address her issues of drug abuse; domestic violence services were expected to be provided once mother had established progress on her substance abuse services.

{¶ 3} Prior to the disposition hearing, the maternal aunt indicated that she could no longer care for the children. LCCS then identified paternal relatives in Arizona that might be interested in taking the children. At the disposition hearing, mother consented that temporary custody of the children should be awarded to LCCS pending an interstate review of the paternal relatives in Arizona.

{¶ 4} On December 7, 2020, the trial court held a reasonable efforts review hearing. Based on the testimony of the LCCS caseworker, Danielle Stroble, the trial court found that mother had been sporadically attending substance abuse treatment, was unsuccessfully discharged from Racing for Recovery, and was in the process of seeking treatment through the Zepf Center.

{¶ 5} At the annual review hearing on June 3, 2021, Stroble testified that mother had made very little progress regarding her substance abuse issues. Stroble also testified

2.

that the children's placement in Arizona was recently disrupted, and that the agency would be seeking permanent custody of the children.

{¶ 6} On June 24, 2021, LCCS moved for permanent custody of L.H. and N.H., and a pretrial hearing was scheduled for August 13, 2021. Summons was sent by certified mail to mother's address, and an entry showing that it was successfully delivered was entered on August 5, 2021. At the August 13, 2021 pretrial hearing, mother's attorney noted that mother had sent her a message stating that mother could not be at the pretrial hearing because she had a scheduled medical appointment. The matter was then set for the permanent custody hearing on October 6, 2021.

{¶ 7} Prior to the October 6, 2021 hearing, mother retained a new attorney, and the permanent custody hearing was ultimately rescheduled to January 26, 2022. Notice of the January 26, 2022 hearing date was sent to mother's attorney.

{¶ 8} At the start of the January 26, 2022 permanent custody hearing, mother's counsel moved for a continuance because mother was not at the hearing. Counsel relayed that mother had moved and changed her phone number, and that mother claimed that she did not receive notice of the hearing. Counsel informed the court, however, that he had spoken with mother and told her that the hearing was on January 26, 2022, and that he had mailed notice of the hearing to mother shortly after the hearing date was set several weeks earlier. Counsel stated that he spoke with mother that morning, and learned for the

3.

first time that mother had moved and changed her phone number. The trial court denied mother's motion for a continuance, and proceeded with the hearing.

{¶ 9} At the permanent custody hearing, Stroble testified that she first began working with the family in May 2019, when the agency received allegations of abuse or neglect. Stroble worked with the family in a non-custody manner, offering case plan services for substance abuse, mental health, and domestic violence. Stroble testified that the complaint was filed in June 2020 because mother was not engaging in case plan services, she was not consistently providing drug screens when requested, and she was not following through with treatment.

{¶ 10} Stroble explained that throughout her involvement with the case, mother has been linked to ten different substance abuse treatment providers. Mother received a mental health and substance abuse diagnosis from Harbor and worked with them in July 2019 for about one month. Mother's performance at Harbor was not consistent, and Harbor discontinued her services. In September 2019, mother went to the Zepf Center, and again received a mental health and substance abuse diagnosis. Mother did not consistently meet with the therapist, and as things began moving to video therapy with the onset of Covid-19, mother felt like the Zepf Center was not a good provider for her. Mother next went to Midwest Ohio Treatment center, and completed a dual diagnostic assessment in March 2020, which again resulted in a mental health and substance abuse diagnosis. Mother was discharged from Midwest Ohio Treatment in April 2020 due to

4.

non-compliance and needing a higher level of care. Mother next went to Arrowhead in April 2020, and was unsuccessfully discharged on May 26, 2020, due to noncompliance. Arrowhead referred mother back to the Zepf Center, and mother completed an intake there on June 1, 2020. Mother then relapsed and admitted to drinking alcohol and using cocaine. On September 15, 2020, mother went to Racing for Recovery in its partial hospitalization program. According to Stroble, mother did well in the in-patient portion of the program. However, mother began a new relationship with a man and no longer wanted to live in the housing situation at Racing for Recovery. Mother was unsuccessfully discharged from Racing for Recovery on November 19, 2020, for noncompliance and continued drug usage. Mother then went to UTMC for a detox program from January 25, 2021, through January 28, 2021. Mother next went to Brightview for treatment from February 2021 until approximately April 2021. Mother felt that Brightview was not intense enough for her, and went back to Arrowhead on May 24, 2021. Mother wanted to do the partial-hospitalization program at Arrowhead, but that did not work out. So mother chose Serenity Christian Counseling, and was receiving services there from July 28, 2021, until January 7, 2022, when she was discharged for noncompliance.

{¶ 11} As to the children, Stroble testified that L.H. and N.H. were originally placed with a maternal aunt, with the goal of awarding legal custody to the aunt. However, on the day of the disposition hearing, the aunt decided that she could no longer

5.

keep L.H. and N.H. because she already had a lot of children of her own and mother was causing additional stress by showing up for visits at unscheduled times, not being productive with her visits, texting the aunt late at night, and complaining about the aunt and the placement. The children were then moved to Arizona to be with a paternal aunt and uncle, with the hope of awarding legal custody. Six months after the placement, the aunt and uncle notified Stroble that they could no longer care for L.H. and N.H., and the children were placed in foster care. Upon returning from Arizona, the children were separated and placed with different families.

{¶ 12} Following the disruption of the placement with the paternal aunt and uncle, Stroble spoke with a different maternal aunt, the maternal grandfather, the paternal grandparents, and a friend of mother, but none of them were able to take care of L.H. and N.H. Late in the process, Stroble also spoke with two female friends of father. Stroble informed the two friends that because the agency had already made the determination to seek permanent custody, the friends would have to become licensed foster parents to express interest in adopting the children. At the time of the permanent custody hearing, one of the friends, "Kim," had engaged in and completed the foster parenting classes, but Stroble was unaware of where Kim was at as far as the rest of the process, including things like home studies, fingerprinting, and fire inspections.

{¶ 13} Stroble also testified regarding how the children were doing in their placements. Stroble testified that since the children were separated, the younger child,

N.H. has flourished. N.H. has been placed with the same family that she was with prior to moving to Arizona so the caregivers are familiar to her. Stroble explained that not being with L.H. has allowed N.H. to develop her own personality. Before that, N.H. would mimic L.H.'s behaviors.

{¶ 14} L.H., unfortunately, has struggled and has a lot of behavioral issues. L.H. has been diagnosed with ADHD, ODD, and PTSD. L.H. has been consistent in counseling and was scheduled for a follow up psychiatric evaluation in February 2022. L.H. has been in several placements since returning from Arizona because of her behavior, which has included being violent toward animals, sexually acting out, being verbally or physically abusive to other younger or disabled children, and lacking empathy. Stroble testified that L.H. has also had a lot of behavioral issues at school as a kindergartner. Stroble stated that L.H. was a very smart little girl, and she could speak about a lot of things that she has witnessed throughout her life.

{¶ 15} The only other witness to testify was the guardian ad litem, Robin Fuller. Fuller testified that she does not believe that mother has accepted that she is a drug addict, and has not made a commitment to sobriety. Fuller recommended that permanent custody to LCCS was in the children's best interests, and testified that she could not think of any realistic alternative to permanent custody.

{¶ 16} Following the hearing, on March 1, 2022, the juvenile court entered its judgment awarding permanent custody of the children to LCCS. The court first found

7.

that mother was duly served and notified of the hearing, but failed to appear. The court then found under R.C. 2151.414(B)(1)(a), that the children cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. Specifically, the court found that the circumstances under R.C. 2151.414(E)(1), (2), (4), and (14) applied to mother. The court then held that permanent custody to LCCS was in the children's best interests. In reaching that decision, the court found that the interaction and interrelationship of the children with the children's caregivers, and the lack of commitment the parents have shown, supported an award of permanent custody to LCCS. Further, the court determined that the children had been in the temporary custody of LCCS for 15 months, and that the children's need for a legally secure placement could not be achieved without a grant of permanent custody to LCCS.

## II. Assignments of Error

{¶ 17} Mother has timely appealed the juvenile court's March 1, 2022 judgment terminating her parental rights, and now asserts two assignments of error for our review:

> 1. The trial court's decision was against the manifest weight of the evidence as it was not in the best interest of the child to grant permanent custody of the child to Lucas County Children Services.

> 2. The court violated appellant's due process as she has never received notice of the permanent custody hearing.

8.

## III. Analysis

## A. Manifest Weight

{¶ 18} In her first assignment of error, mother argues that the juvenile court's decision was against the manifest weight of the evidence.

{¶ 19} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find, by clear and convincing evidence, two things: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Id.*

{¶ 20} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. We recognize that, as the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *Id.*, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d

9.

Dist.1994). Thus, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 21} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met. Here, the trial court found that R.C. 2151.414(E)(1), (2), (4), and (14) applied to mother.

{¶ 22} Because only one factor is needed to support the trial court's conclusion under R.C. 2151.414(B)(1)(a), we will begin and end our analysis with R.C. 2151.414(E)(1). Notably, mother does not make any arguments relative to the trial

10.

court's finding that the children cannot be placed with her within a reasonable time or should not be placed with her, either broadly or with regard to the specific factors found by the trial court under R.C. 2151.414(E).

{¶ 23} The factor stated in R.C. 2151.414(E)(1) is

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 24} Here, the record demonstrates that despite mother's consistent referral to drug counseling and treatment, she has continuously and repeatedly failed to successfully complete any of those services, oftentimes being discharged for noncompliance. Therefore, we hold that the trial court's determination under R.C. 2151.414(E)(1) is not against the manifest weight of the evidence.

11.

{¶ 25} Turning to whether permanent custody was in the best interests of the children, R.C. 2151.414(D)(1) provides several factors that the trial court must consider in making its determination, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 26} In support of her assignment of error, mother argues that the trial court failed to follow guidelines under Ohio law to look into the possibility of legal custody to

12.

father's friend Kim. Mother notes that Kim had gone through foster care classes and expressed an interest in receiving custody of the children. Thus, mother contends that it was against the manifest weight of the evidence to award permanent custody to LCCS when there were family friends that were available to take custody of the children.

{¶ 27} Upon review, we do not find that the juvenile court's decision that permanent custody was in the best interests of the children was against the manifest weight of the evidence. Here, the record reflects that Stroble made numerous efforts to find a suitable familial placement for the children. Late in the process, after LCCS had already moved for permanent custody, Kim expressed interest in obtaining custody of the children. At the time of the hearing, Kim was not approved through the foster care process, and it was not clear when she would be approved. After 15 months of placements, the trial court determined that the children needed permanency, and we cannot disagree. Furthermore, the record contains no evidence regarding Kim's relationship with the children, whether the children are close to her, or whether they even know who she is. In contrast, the record reflects that at least N.H. knows her current foster parents and is thriving with them. Therefore, we hold that the trial court's finding—that permanent custody to LCCS was in the best interest of the children—is not against the manifest weight of the evidence.

{¶ 28} Accordingly, mother's first assignment of error is not well-taken.

13.

## B. Due Process

{¶ 29} In her second assignment of error, mother argues that her due process rights were violated in that she was not provided notice of the permanent custody hearing.

{¶ 30} "[D]ue process requires both notice and an opportunity to be heard." *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13 (2007). "In accordance with this requirement, the government must *attempt* to provide actual notice to interested parties if it seeks to deprive them of a protected liberty or property interest." (Emphasis sic.) *Id.* at ¶ 14. "However, due process does not require that an interested party receive *actual* notice." (Emphasis sic.) *Id.*

{¶ 31} "When a permanent custody motion is filed and a permanent custody hearing is scheduled, notice is to be given as set forth in R.C. 2151.414(A)(1)." *In re Keith Lee P.*, 6th Dist. Lucas No. L-03-1266, 2004-Ohio-1976, ¶ 7. R.C. 2151.414(A)(1), states, in relevant part, "Upon the filing of a motion pursuant to section 2151.413 of the Revised Code for permanent custody of a child, the court shall schedule a hearing and give notice of the filing of the motion and of the hearing, in accordance with section 2151.29 of the Revised Code, to all parties to the action and to the child's guardian ad litem." R.C. 2151.29 provides, "Service of summons, notices, and subpoenas, prescribed by section 2151.28 of the Revised Code, shall be made by delivering a copy to the person summoned, notified, or subpoenaed, or by leaving a copy

14.

at the person's usual place of residence. If the juvenile judge is satisfied that such service is impracticable, the juvenile judge may order service by registered or certified mail."

{¶ 32} "For proper service, the parents must be notified of the permanent custody motion and the initial permanent custody hearing by one of three methods: personal service, service by certified or registered mail * * *, or—if both those methods fail—by publication." *In re Keith Lee P.* at ¶ 8, citing R.C. 2151.29; Juv.R. 16. "Afterwards, constructive notice of hearings is proper." *Id.* "Normally, notice of new or rescheduled hearings is sent to the parent's attorney, as prescribed under Juv.R. 20." *Id.*, citing *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, 782 N.E.2d 665, ¶ 37-39 (7th Dist.). Indeed, Juv.R. 20(B) states, "Whenever under these rules or by an order of the court service is required or permitted to be made upon a party represented by an attorney, the service shall be made upon the attorney unless service is ordered by the court upon the party. Service upon the attorney or upon the party, and proof of service, shall be made in the manner provided in Civ.R. 5(B)."

{¶ 33} Here, the permanent custody motion was served upon mother's attorney by electronic mail in accordance with Civ.R. 5(B)(2)(f). In addition, the docket reflects that a summons in the permanent custody matter was successfully served by certified mail on mother. Thereafter, any rescheduling of the trial dates were properly served on mother's counsel. Finally, mother's counsel stated at the permanent custody hearing that he had spoken with mother and she knew that the permanent custody hearing was scheduled for

15.

January 26, 2022.  Therefore, we hold that mother was properly notified of the permanent custody hearing and also received constructive notice of the hearing, and thus her due process rights were not violated.  *See In re D.H.*, 177 Ohio App.3d 246, 2008-Ohio-3686, 894 N.E.2d 364, ¶ 36-38 (8th Dist.) (mother had notice of hearing and due process rights were not violated where, even though court sent notice to the wrong address, counsel was properly notified and informed mother of the trial date); *In re Keith Lee P.* at ¶ 14 (due process rights not violated where mother received personal service of the motion for permanent custody and notice of the initial permanent custody hearing, and where counsel informed mother of final permanent custody hearing).

{¶ 34} Accordingly, mother's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 35} For the foregoing reasons, we find that substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                     _____
                                                    JUDGE

Thomas J. Osowik, J.

                                         _____
Christine E. Mayle, J.                                 JUDGE
CONCUR.

                                         _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.