[Cite as *In re J.D.*, 2024-Ohio-282.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.D.

Court of Appeals Nos.  L-23-1221
L-23-1233

Trial Court No.  JC 22290363

## DECISION AND JUDGMENT

Decided:  January 26, 2024

* * * * *

Rena (Laura) Laws, for appellee.

Misty Wood, for appellants.

* * * * *

**SULEK, J.**

{¶ 1} In this expedited, consolidated appeal, appellants mother, K.W., and father, G.D., appeal the September 21, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated their parental rights and awarded custody of minor child, J.D., to appellee Lucas County Children Services ("LCCS").  For the reasons that follow, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} Mother and father are the parents of J.D., born in August 2022. This matter was initiated on August 15, 2022, when LCCS filed a complaint in dependency and neglect. The complaint alleged that LCCS received a referral that mother had been released from jail and was on parole out of Cleveland, Ohio; she was sent to Lucas County to separate her from father. Mother had a history of psychiatric inpatient admissions and was neither engaged in mental health services nor compliant with her prescribed medications. It was also reported that mother had a long history of substance abuse issues involving methamphetamines. Father was reportedly incarcerated in Lorain, Ohio, on retaliation, menacing by stalking, and robbery charges. The complaint alleged that the two abused substances together and that they were violating a "no contact order."

{¶ 3} The complaint stated that mother had just given birth and a LCCS caseworker visited mother and child at the hospital. There were concerns that mother did not have the ability to care for J.D. She could not independently feed him, allegedly fell asleep on top of the child, failed to follow through on resources offered to help care for J.D., and attended only two prenatal appointments during her pregnancy.

{¶ 4} A shelter care hearing was held and J.D. was placed in interim temporary custody of LCCS. On October 13, 2022, the trial court held an adjudication hearing. On October 21, 2022, the trial court filed its judgment entry finding J.D. to be dependent and neglected. The court awarded temporary custody of J.D. to LCCS.

2.

**{¶ 5}** During this time, case plan services were provided to mother with the goal of reunification. Mother was required to complete a diagnostic assessment and follow all recommendations, complete a drug and alcohol assessment and complete all recommendations, and complete an interactive parenting program. She was also ordered to comply with the terms of her parole and any related legal issues. Mother was awarded one hour weekly, supervised visitation. Father was added to the case plan in May 2023, following his release from incarceration. The case plan required father to complete the services of a diagnostic dual assessment and follow through with all recommendations and parenting and anger management programs.

**{¶ 6}** On February 6, 2023, mother filed a motion requesting that venue, services, and placement be transferred to Cuyahoga County where she resides. The motion was denied on August 3, 2023, following a pretrial hearing.

**{¶ 7}** At subsequent case plan review hearings, evidence was presented that after a delay caused, in part, by mother relocating to the Cleveland area, mother was unable to provide a urine screen to complete a dual diagnostic assessment. LCCS had not referred mother for parenting services because the assessment was not completed. Mother represented that she had appointments scheduled with mental health providers. LCCS expressed concern over other individuals being present during virtual visitations.

3.

**{¶ 8}** Father filed a motion for reunification with J.D. He stated that he was compliant with the case plan, he had a suitable residence, and that visitation between mother and child would be better facilitated in Cleveland.

**{¶ 9}** On May 31, 2023, LCCS moved for permanent custody of J.D.

**{¶ 10}** Mother filed a motion to continue the permanent custody hearing scheduled for September 5, 2023. She stated that maternal grandfather's interest in pursuing legal custody of J.D. necessitated a continuance so that a home study could be conducted. LCCS' opposition stated that grandfather was unable to provide an address or confirmation of a lease to establish independent housing. The motion was subsequently denied.

## II. Permanent Custody Hearing

**{¶ 11}** Prior to the start of the permanent custody hearing, father's counsel requested a continuance after just receiving five discovery documents from LCCS's attorney who had been ill. The LCCS attorney represented that the discovery was "pretty standard" and that only father's dual diagnostic assessment report would take any time to review. The trial court then gave counsel approximately 20 minutes to review the materials. Counsel then indicated that he had "a general grasp of the content of the documents" but that he did not review them "in depth." He expressed belief that the contents of the materials was hearsay and that he would enter objections where appropriate.

4.

**{¶ 12}** When asked whether he was prepared to go forward, mother's counsel stated:

> MR. FINKLER: I concur, likewise, with what Mr. Rowell stated. And also just that, you know, they were received today. The pretrial order was 14 days prior. * * *.

> THE COURT: Is there any reason for you to ask for a continuance at this time, other than – you have the discovery, and it sounds like you've had the opportunity to review it, whatever it is.

> MR. FINKLER: Not beyond – no, I suppose not, Your Honor. No.

**{¶ 13}** The trial court stated: "[F]or some reason during the course of the trial like any trial if there was some information shared that the parties weren't privy to, they can always ask for a continuance – sorry, a continuance for them to have additional time so they can move through their case." The hearing then commenced.

**{¶ 14}** LCCS caseworker, Emily Costell, testified that the agency received a referral that mother was 36 ½ weeks pregnant and that there were serious concerns for her mental health and her ability to care for the child. Mother was on parole from a juvenile conviction. She was sent from Cleveland to a Lucas County shelter due to human trafficking and prostitution concerns involving father. Though negative for illegal substances at J.D.'s birth, mother had a history of methamphetamine use. In August

5.

2022, father was incarcerated on robbery, menacing by stalking, and retaliation charges. Father reportedly attacked the judge involved in mother's criminal case.

{¶ 15} Costell testified that the agency's request for permanent custody followed the parents' failure to comply with case plans services. As to mother, she was to complete a dual diagnostic assessment, interactive parenting classes, and follow through with her legal obligations. Costell stated that mother was initially linked with mental health services and was diagnosed with borderline personality disorder and major depressive disorder and was prescribed medications.

{¶ 16} In September 2022, based on mother's belief that there was nothing wrong with her, mother stopped mental health counseling and medication use. Following a parole hearing in October 2022, the supervising judge sentenced her to a minimum of 30 days at an inpatient youth mental health facility. Upon discharge, mother returned to Cleveland where she currently resides.

{¶ 17} In January 2023, mother completed a dual diagnostic assessment at St. Vincent Medical Charity Center which recommended mental heath services. Costell testified that between January and August 2023, mother attended 10 of her 24 therapy appointments and approximately half of her doctor appointments. In August, mother told her therapist that she did not need mental health services and would not be scheduling any future appointments.

6.

{¶ 18} Per LCCS policy, mother did not begin parenting classes because she had not sufficiently addressed her mental health issues. She was not compliant with the requirement that she provide random urine samples, as she provided only one during the course of the proceedings, or with the parole condition that she attend parenting classes.

{¶ 19} Father was added to the case plan in May 2023, following his release from incarceration. He completed his dual diagnostic assessment in June, but could not begin therapy because he was incarcerated again after allegedly strangling mother. The strangulation and domestic violence against a pregnant individual charges were pending on the date of the hearing. Mother told Costell that it was just a misunderstanding and that the argument was strictly verbal. She stated that marks on her neck were from the dog.

{¶ 20} Father was also referred to anger management classes; the place he selected and initially contacted tried to return his call multiple times but received no response. Father was also recommended for substance abuse services and his May 23, 2023 urine screen was positive for amphetamines and methamphetamines.

{¶ 21} Mother was fairly consistent with Level 1, or supervised agency visitation, until her move to Cleveland. Visits were then virtual, once a week for one hour with agency monitoring. Father was added to the virtual visits. Costell stated that they were not punctual for the visits and that there were concerns that mother was acting inappropriately, she would not engage and would look away from the screen.

**{¶ 22}** Once father was released and had a vehicle, mother and father attended two or three Level 1 visits at the agency. Costell reported that there were no concerns during the visits but that father had to tell mother what to do and how to interact with J.D.

**{¶ 23}** As to J.D., he completed an assessment and was developmentally on target. Costell stated that he is doing very well in foster placement. For relative placement, Costell stated that initially a paternal uncle was interested but ultimately decided he was unable to care for J.D. Mother gave maternal grandfather's contact information to the agency approximately a month prior to the hearing. Costell stated that when she spoke with grandfather, he admitted that he and his wife did not have an address and were staying with friends and family or camping but that they were looking at two different homes. Costell testified that she stressed the time-sensitive nature of getting his address so the agency could begin a home study; she did not hear back from him.

**{¶ 24}** Costell was questioned about mother's desire to have the case transferred to Cuyahoga County due to her lack of ties to Lucas County. She was also questioned about difficulties in obtaining drug screens and remote monitoring of case plan progress. Costell stated that LCCS was willing to work remotely to help the family find and coordinate with providers and receive progress reports.

**{¶ 25}** Mother and father presented no witnesses and rested. Several exhibits were admitted into evidence. Mother's counsel requested and was granted permission to cross-examine the caseworker on a document received just before the hearing.

8.

{¶ 26} Costell testified that the LCCS requested information from Providence Center, a parenting services provider. She explained that the services were provided through mother's juvenile parole. Costell acknowledged mother's attendance at eight classes from August through October 2022. She agreed that mother's cessation correlated with the court ordering her to in-patient mental health treatment.

{¶ 27} Teresa K., the Court Appointed Special Advocate ("CASA") testified that she was appointed to the case in mid-August, prior to J.D.'s birth. She visited Beach House, where mother was staying, and spoke with mother and her counselor. Mother believed that LCCS' removal of J.D. from her custody was unwarranted.

{¶ 28} The CASA observed mother with J.D. at two agency visits. During the January 2023 visit, the CASA was concerned when mother showed little affection for J.D., no hugging or kissing, and that she held him facing away from her. In May 2023, father was present and both were excited to see him. Father did most of the hands-on interacting; mother's engagement was not physical.

{¶ 29} The CASA had monthly visits with J.D. and stated that he is doing very well in his foster placement. The foster mother is willing to adopt J.D. as well as his unborn sibling, if necessary.

{¶ 30} The CASA stated that she had concerns with mother's and father's ability to parent J.D. She stated that mother's life lacks consistency as she is continually notifying the CASA of new phone numbers and e-mails. Both parents have lost the foster

9.

parent's contact information. Two virtual visits were missed in July 2023 and two in August 2023. She stated that she missed one visit because she had an appointment and one because she was busy trying to find a placement for J.D. The CASA stated that father has anger management issues and his current incarceration demonstrates inability to be successful while on parole.

{¶ 31} The CASA then testified regarding her August 2023 written report and recommendation which was filed with the court and also admitted into evidence. The CASA stated that she believed that LCCS should be awarded permanent custody of J.D. The recommendation was based on the inconsistency of the parents and lack of prioritization.

{¶ 32} As to potential relative placements, the CASA stated that paternal uncle thought that having J.D. would cause issues and that he did not want to have to deal with mother and father. Uncle stated that all of mother's relatives were "druggies" and not suitable for placement. Maternal grandmother was homeless and sometimes lived with mother and father. Maternal grandfather did not respond to the CASA's e-mail.

{¶ 33} On September 8, 2023, the trial court announced its judgment terminating the parties parental rights and awarding custody of J.D. to LCCS. In its September 21, 2023 written judgment entry, the trial court found that under R.C. 2151.414(E)(1), notwithstanding reasonable case planning and efforts by LCCS, mother and father failed to remedy the conditions causing J.D. to be placed outside the home by not completing

10.

case plan services. Mother failed to address her mental health issues and father remained incarcerated. Neither parent completed a parenting program.

{¶ 34} The trial court found that under R.C. 2151.414(E)(2), mother suffers from such severe, chronic mental illness that she is presently unable to care for J.D. and that it is unlikely that it will be remedied. Under R.C. 2151.414(E)(4), that mother and father demonstrated a lack of commitment to J.D. by failing to regularly support, visit, or communicate or complete case plan services. As to father, the court found that under R.C. 2151.414(E)(13), his repeated incarceration prevents him from providing care for J.D.

{¶ 35} Finally, the court found under R.C. 2151.414(D)(1) that it was in J.D.'s best interest to award permanent custody to LCCS. J.D. had been with is foster family since birth, was bonded with them, and they are interested in adopting him. The court concluded that no suitable relative placement was found and that J.D. deserves a legally secure permanent placement.

### III. Assignment of Error

{¶ 36} Mother and father have timely appealed the judgment terminating their parental rights and raise the following assignment of error: [1]

> The trial court erred in not granting the requested continuance due to new discovery being presented immediately before trial commenced. The

---

[1] Though not separately delineated, appellants have alleged three distinct errors.

trial court erred in not properly considering the effects of the denial [of] Mother's request to transfer the case from Lucas County to Cuyahoga County. Clear and convincing evidence was not presented to prove the child could not be placed with father within a reasonable time or should not be placed with father.

IV. Analysis

A. Continuance

{¶ 37} The parties first argue that the trial court erred by denying their request for a continuance after LCCS provided discovery documents immediately prior to the permanent custody hearing.

{¶ 38} "[T]he right of due process requires that 'a defense counsel be afforded the reasonable opportunity to prepare his [or her] case.'" *In re Al.C.*, 6th Dist. Lucas Nos. L-11-1148, L-11-1161, 2011-Ohio-6315, ¶ 15, quoting *State v. Sowders*, 4 Ohio St.3d 143, 144, 447 N.E.2d 118 (1983). Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." The power of the trial court in a juvenile proceeding to grant or deny a continuance under Juv.R. 23 is broad and is reviewed under an abuse of discretion standard. *In re Jordan B.*, 6th Dist. Lucas No. L-06-1161, 2007-Ohio-2537, ¶ 16, citing *In the Matter of Daniel K.*, 6th Dist. Nos. OT-02-025, OT-02-023, 2003-Ohio1409, ¶ 23-26. *See In re H.W.*, 2018-Ohio-523, 107 N.E.3d 82, ¶ 29 (6th Dist.). "Furthermore, the complaining party 'must show how he [or

12.

she] was prejudiced by the denial of the continuance before there can be a finding of prejudicial error.'" *In re M.B.*, 4th Dist. Pike No. 18CA888, 2018-Ohio-3778, ¶ 21, quoting *State v. Broom,* 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988). *See In re A.D.*, 2023-Ohio-2442, 221 N.E.3d 259, ¶ 38 (3d Dist.)

{¶ 39} As set forth above, due to illness, counsel for LCCS was unable to provide various documents until the morning of the permanent custody hearing. The trial court granted a short recess for counsel to review the materials. After reconvening, the parties' attorneys expressed no compelling reason why the hearing should not proceed. Notably, mother's counsel cross-examined the caseworker over perceived inconsistencies in one of the documents. The parties have failed to argue how mother or father suffered prejudice by the court's denial of the request for a continuance. Having found no abuse of the trial court's discretion, the argument is rejected.

## B. Venue

{¶ 40} The parties next contend that the trial court failed to properly consider mother's motion to transfer the case to Cuyahoga County. "[T]he decision to transfer venue is generally within the juvenile court's broad discretion." *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 25; *In re Don B.*, 6th Dist. Huron No. H-02-033, 2003-Ohio-1400, ¶ 11.

{¶ 41} R.C. 2151.27 and Juv.R. 10(A) permit a complaint alleging that a child is dependent to be filed either where the child resides or where the alleged dependency

13.

occurred. *In re B.B.*, 3d Dist. Defiance No. 4-10-17, 2012-Ohio-2695, ¶ 18. A mandatory change of venue is required only where proceedings involving the same child are pending in another county where the child resides. Juv.R. 11. *Id.* at ¶ 20; *In re Don B.* at ¶ 11.

{¶ 42} In the present matter, because no other cases involving J.D. were pending during the proceedings, the court had discretion in determining whether to transfer the matter to Cuyahoga County. J.D. was born in and was residing in Lucas County during the proceedings. Other than convenience of the parents, there is no other compelling reason to suggest that the trial court abused its discretion by denying the motion. The parties' argument is rejected.

### C. Permanent Custody

{¶ 43} Father argues that the trial court's determination that J.D. could not be placed with him was not supported by clear and convincing evidence. A decision to terminate parental rights in a permanent custody case will not be reversed unless it is against the sufficiency of the evidence and/or the manifest weight of the evidence. *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703. *See In re L.H.*, 6th Dist. Lucas No. L-22-1078, 2022-Ohio-3263, ¶ 20, citing *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11.

{¶ 44} A juvenile court must find by clear and convincing evidence that terminating parental rights and awarding permanent custody to a children services agency

14.

satisfies the permanent custody test set forth in R.C. 2151.414. *In re Z.C.*, 6th Dist. Huron Nos. H-20-020, H-20-021, 2021-Ohio-763, ¶ 22, citing *In re B.K.*, 6th Dist. Lucas No. L-17-1082, 2017-Ohio-7773, ¶ 16. Clear and convincing evidence is defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703 at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 45} Under a manifest weight analysis, even if the trial court's judgment is supported by sufficient evidence, a reviewing court may still find that the trial court's decision was erroneous where, "'in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *Id.* at ¶ 14, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.3d 517, ¶ 20.

15.

{¶ 46} The two-part test of R.C. 2151.414 requires the juvenile court to find, by clear and convincing evidence, that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children

services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 47} The juvenile court must then determine whether permanent custody to the agency is in the best interest of the child. R.C. 2151.414(A)(1). *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.3d 532, ¶ 32-37.

{¶ 48} Father argues that the court erred in awarding permanent custody of J.D. to LCCS because no "significant concerns" were raised regarding his completion of the case plan requirements, he properly interacted with the child, and father was as committed to J.D. as he could be given his incarceration and geographic location. Father states that he "substantially remedied" the conditions in R.C. 2151.414(E)(1) and (4).

{¶ 49} As set forth above, in terminating father's parental rights to J.D., the trial court found R.C. 2151.414(E)(1), (4), and (13) applicable. Under R.C. 2151.414(E)(1)

17.

and (4), the trial court found that father did not complete his case plan services and was incarcerated. The evidence at the hearing clearly and convincingly supports this finding. While father completed a dual diagnostic assessment, he did not attend parenting or anger management classes. The court concluded that father's lack of progress on the case plan and repeated incarceration demonstrated a lack of commitment to J.D. Finally, clear and convincing evidence supported the court R.C. 2151.414(E)(13) finding that father's repeated incarceration prevents him from caring for J.D. Accordingly, the trial court's findings under R.C. 2151.414(E) are supported by clear and convincing evidence and are not against the manifest weight of the evidence.

{¶ 50} Mother and father's assignment of error is not well-taken.

### IV. Conclusion

{¶ 51} For the foregoing reasons, the September 21, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother and father are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

18.

Thomas J. Osowik, J.       _____
                   JUDGE

Myron C. Duhart, J.

                 _____
Charles E. Sulek, P.J.       JUDGE
CONCUR.

                 _____
                   JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.